## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| GERHARD HECKERMANN, derivatively on behalf of CPI CARD GROUP, INC., | |
| Plaintiff, | Case No.: |
| vs. | |
| STEVEN MONTROSS, DAVID BRUSH, JERRY DREILING, DIANE FULTON, DAVID PEARCE, ROBERT PEARCE, NICHOLAS PETERS, DAVID ROWNTREE, BRADLEY SEAMAN, TRICOR PACIFIC CAPITAL PARTNERS (FUND IV), LIMITED PARTNERSHIP, TRICOR PACIFIC CAPITAL PARTNERS (FUND IV) US, LIMITED PARTNERSHIP, and TRICOR PACIFIC CAPITAL, INC. | |
| Defendants, | |
| and | |
| CPI Card Group, Inc., | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Gerard Heckermann ("Plaintiff"), by his undersigned attorneys, derivatively and

on behalf of Nominal Defendant CPI Card Group, Inc. ("CPI" or the "Company"), files this

Verified Shareholder Derivative Complaint against Individual Defendants Steven Montross, David

Brush, Jerry Dreiling, Diane Fulton, David Pearce, Robert Pearce, Nicholas Peters, David

Rowntree, and Bradley Seaman (collectively, the "Individual Defendants") and Tricor Pacific

Capital Partners (Fund IV), Limited Partnership, Tricor Pacific Capital Partners (Fund IV) US,

Limited Partnership, and Tricor Pacific Capital, Inc. (collectively, the "Tricor Fund Defendants,"

and together with the Individual Defendants and CPI, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of CPI, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants and Tricor Fund Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CPI, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by CPI's directors and officers from October 8, 2015 through the present (the "Relevant Period").

2.      CPI is in the business of manufacturing and selling financial payment cards, such as credit, debit, and prepaid debit cards, commanding a 35% market share in the United States.

3.      CPI has moved toward the manufacture of "EMV" cards, colloquially known as "chip" cards.[1]

4.      EMV cards store data on integrated circuits, offering greater fraud protection for issuers and users as compared to the formerly ubiquitous magnetic stripe cards.

---

[1] EMV stands for Europay, MasterCard, and Visa, who are the three firms that initially crafted the technical standards for the cards.

5.     As further detailed below, and as known by anyone who has recently paid by card in a bricks-and-mortar retail establishment, EMV cards are rapidly replacing the magnetic stripe cards which had dominated the payment card market for decades.

6.     CPI filed a Registration Statement on Form S-1 with the SEC on July 7, 2015 in order to pursue an initial public offering. After several amendments, the Form S-1 was declared effective on October 8, 2015 and utilized to conduct an initial public offering of CPI shares (the "IPO"). A final prospectus was filed on October 9, 2015 (the "Prospectus"). The Prospectus, the Form S-1, and all amendments thereto are referred to collectively herein as the "Registration Statement." The IPO was completed on October 15, 2017.

7.     The Registration Statement made a number of false and misleading statements and omissions of fact necessary to prevent other statements from being misleading.

8.     Leading up to the IPO, CPI had made significant investments into EMV card production. At the time of the IPO, the Company often boasted that it was "well-positioned to capitalize on the U.S. market conversion to EMV."

9.     In fact, at the time of the IPO, CPI was reporting strong growth in EMV card sales, and the Company disclosed no information that would indicate that such growth might not be expected to continue.

10.     However, despite the positive outlook presented by the Company in connection with the IPO, the Company knew or should have known of the existence of several adverse trends affecting sales of EMV cards at the time of the IPO.

11.     For instance, the Company failed to disclose that its largest customers were overstocked with EMV cards at the time of the IPO. CPI was similarly overstocked, so much so that it was expanding vaults at its facilities in order store the excess cards in its own inventory.

One former CPI employee reported that "piles" of excess cards were being stored on employees' desks while the Company worked to expand their vaults.

12.     The Company knew or should have known about the overstocking occurring with its largest customers, as it boasted that it had "long-standing trust-based relationships with our key customers and often deep process and technology integration."

13.     Further, the millions and millions of cards accumulating in CPI's inventory gave the Company ample evidence of the massive excess of cards and diminishing demand for EMV cards that could be expected to continue into the future.

14.     Meanwhile, the switch to EMV cards caused increased pricing pressure and competition from other manufacturers, which the Company failed to disclose at the time of the IPO.

15.     Further, the Company failed to disclose that small and midsize card issuers -- described by CPI as its "core" market segment in which CPI held its "highest market share" -- were slow to adopt EMV cards, which dampened demand for CPI's EMV cards.

16.     Prior to the IPO, the Company was majority (90.9%) owned by Tricor Pacific Capital Partners (Fund IV), L.P. and Tricor Pacific Capital Partners (Fund IV), L.P. US, both of which are managed by Tricor Pacific Capital, Inc.

17.     In connection with the IPO, the Company sold 17,250,000 shares of common stock for a price per share to the public of $10.00. CPI received aggregate proceeds of approximately $164 million from the IPO, net of underwriters' discounts and commissions.

18.     Of the shares sold, 2.25 million were sold by certain stockholders of the Company, including the Tricor Fund Defendants and Defendants Steven Montross, Robert Pearce, and Jerry Dreiling.

19.     Following the IPO, the Tricor Fund Defendants owned approximately 57.5% of the Company's stock.

20.     On November 12, 2015, just one month after the IPO, the Company disclosed what it termed "a very modest pull forward" of sales from the fourth quarter to the third quarter, providing the first glimpse into a pattern of issuers overstocking cards that had been occurring for months prior to the IPO. The pull-forward involved sales that were expected to occur in the fourth quarter occurring instead in the third quarter, diminishing fourth quarter sales.

21.     As a result of the adverse trends outlined above, CPI was forced to reduce its fiscal year 2016 guidance in a May 11, 2016 press release.

22.     Upon this news, price per share of CPI stock dropped precipitously from a close of $7.66 on May 11, 2016, to close at $4.01 on May 12, 2016 -- a drop of $3.65 per share, or over 47%.

23.     As of the filing of this Complaint, CPI common stock was trading at around $1.00 per share, approximately a 90% loss in value compared to the IPO price.

24.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

25.     During the Relevant Period, the Individual Defendants and Tricor Fund Defendants, in breach of their fiduciary duties owed to CPI, willfully or recklessly made and/or caused the Company to make false and/or misleading statements.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) at the time of the IPO, CPI's biggest customers had significant excess inventory of EMV cards as a result of those customers purchasing more cards than they were issuing in the period leading up to the IPO;

(2) CPI itself had been experiencing a rapid accumulation of unsold EMV cards, necessitating the expansion of its vaults in order to securely store this inventory; (3) small and mid-size issuers, which represent a significant part of CPI's business, were slow to adopt EMV technology; (4) the Company was experiencing increased pricing pressure due to competition in the sale of EMV cards; (5) as a result of the foregoing, the growth experienced prior to the IPO could not reasonably be expected to continue; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, CPI's public statements were materially false and misleading at all relevant times.

26.     The Individual Defendants and Tricor Fund Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

27.     The Individual Defendants and Tricor Fund Defendants also breached their fiduciary duties by causing the Company to waste its corporate assets by spending vast amounts of funds on cards for which it was unnecessarily building up a huge inventory that had no bearing with market demand and by causing the Company to pay the Tricor Fund Defendants $10.7 million to redeem Company preferred stock and pay Defendant Montross $4,775,832 to settle his awards under the CPI Acquisition, Inc. Phantom Stock Plan.

28.     Additionally, in breach of their fiduciary duties, the Individual Defendants and Tricor Fund Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

29.     The Individual Defendants' and Tricor Fund Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's former Chief Executive Officer ("CEO"), former Chief Financial Officer ("CFO"), the Company's former Chief

Accounting Officer ("CAO"), and four of the eight directors on the Company's current Board (the "Board")[2] to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales and Company funds for the redemption of Tricor Fund Defendants' Company preferred stock and for settlement of Defendant Montross's awards under the CPI Acquisition, Inc. Phantom Stock Plan, and is costing the Company millions of dollars.

30.     The Company has been substantially damaged as a result of the Individual Defendants' and Tricor Fund Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

31.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of four of the directors' liability in the Securities Class Action, of their not being disinterested and/or independent directors, and of the fact that a majority of the directors are beholden to Tricor Fund Defendants, which benefitted from, caused, and is liable for the fraudulent schemes alleged herein, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[2] Specifically, the Securities Class Action names Robert Pearce, Nicholas Peters, David Rowntree, and Bradley Seaman as defendants.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act of 1933.

33.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

34.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

35.     Venue is proper in this District because CPI is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

36.     Plaintiff is a current shareholder of CPI. Plaintiff has continuously held CPI common stock since during the beginning of the Relevant Period.

### Nominal Defendant CPI

37.     CPI is a Delaware corporation with its principal executive offices at 10026 West San Juan Way, Littleton, CO 80127. CPI's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "PMTS."

**Defendant Montross**

38.     Defendant Steven Montross ("Montross") served as the Company's President and CEO from January 2009, and as a Company director since at least the time of the IPO, until he stepped down from all of his positions at the Company on October 4, 2017. According to the Company's Schedule 14A filed with the SEC on April 20, 2017 (the "2017 Proxy Statement), as of April 18, 2017, Defendant Montross beneficially owned 1,569,772 shares of the Company's common stock, which represented 2.8% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.70, Montross owned over $5.8 million worth of CPI stock.

39.     For the fiscal year ended December 31, 2016, Defendant Montross received $1,245,622 in compensation from the Company. This included $520,192 in salary, $300,003 in stock awards, $396,000 in option awards, and $29,427 in all other compensation.

40.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Montross sold 87,991 shares of Company stock in the IPO, from which he benefited in the amount of approximately $835,914. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

41.     The Company's 2017 Proxy Statement stated the following about Defendant Montross:

> *Steven Montross*, 63, has served as our President and Chief Executive Officer since January 2009. Prior to joining CPI, Mr. Montross was a founding shareholder and Managing Director of FirstLight Financial Corporation, a business that invests senior debt capital in private-equity owned businesses, from 2007 to 2008. Prior to forming FirstLight, Mr. Montross had a 17-year career at General Electric Company, where he held positions of increasing responsibility and leadership

within GE's financial service businesses, including a business that financed private equity-owned enterprises. Mr. Montross holds a Bachelor of Business Administration degree from the University of Michigan and a Masters of Business Administration from the Kellogg School of Management at Northwestern University. Mr. Montross brings to the Board extensive executive leadership experience, and, through his position as our Chief Executive Officer, he brings to the Board management's perspective over a full range of issues affecting the Company.[3]

**Defendant Brush**

42.     Defendant David Brush ("Brush") served as the Company's CFO from 2015 until his resignation on December 31, 2016. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Brush beneficially owned 160,778 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.70, Brush owned approximately $594,878 worth of CPI stock.

43.     For the fiscal year ended December 31, 2016, Defendant Brush received $770,593 in compensation from the Company. This included $450,000 in salary, $184,999 in stock awards, $117,920 in option awards, and $17,674 in all other compensation.

44.     The Company's Schedule 14A filed with the SEC on April 25, 2016 (the "2016 Proxy Statement") stated the following about Defendant Brush:

*David Brush* has served as our Chief Financial Officer since 2015. From 2013 to 2015, Mr. Brush managed Idris Capital Partners, a financial and operational advisory firm. From 2012 to 2013, Mr. Brush served as Group Executive and President—Power Transmission of Rexnord Corporation, a global industrial business in process and motion control and water management. From 1994 to 2011, Mr. Brush served in various roles at Pactiv Corporation, a multi-national manufacturer of packaging and consumer products, including Vice President and General Manager, Specialty Packaging from 2005 to 2011, Vice President and Treasurer from 2000 to 2005, Vice President Finance, Protective & Flexible Packaging from 1997 to 1999 and multiple finance positions within Specialty Packaging from 1994 to 1996. Prior to joining Pactiv, Mr. Brush was Audit Manager at Price Waterhouse LLC from 1987 to 1994. Mr. Brush received his Bachelor's degree in Accounting from the University of Northern Iowa.

---

[3] Emphasis is in the original unless otherwise noted throughout this Complaint.

**Defendant Dreiling**

45.     Defendant Jerry Dreiling ("Dreiling") served as the Company's Vice President and CAO from August 2011 to March 2016, and as the Company's Vice President Finance, Planning, Operations and Support from March 2016 to September 15, 2016.

46.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Dreiling sold 19,941 shares of Company stock in the IPO, from which he benefited in the amount of approximately $216,201. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

47.     The Company's 2016 Proxy Statement stated the following about Defendant Dreiling:

> *Jerry Dreiling* has served as our Vice President Finance, Planning and Operations Support since March 2016.  Prior to that, Mr. Dreiling served as Vice President and Chief Accounting Officer from August 2011 to March 2016, overseeing the Company's audit and budgeting function. From 2000 to 2011, Mr. Dreiling served as Chief Financial Officer of Picosecond Pulse Labs. From 1990 to 2000, he served in several senior financial roles, including Director of Strategic Financial Planning, and business unit Finance Director at Storage Tek. From 1984 to 1990, he served as an officer at United Bank of Denver. Mr. Dreiling received his Bachelor's in Business Administration with honors from the University of Northern Colorado and his Master of Business Administration with honors from Regis University.

**Defendant Fulton**

48.     Defendant Diane Fulton ("Fulton") served as a Company director since December 2015, and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant Fulton beneficially owned 10,634 shares of the Company's common

stock.[4] Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.70, Fulton owned approximately $39,345 worth of CPI stock.

49. For the fiscal year ended December 31, 2016, Defendant Fulton received $130,836 in compensation from the Company, comprised of $60,000 in fees paid or earned in cash, and $70,836 in fees earned or paid in stock.

50. The Company's 2016 Proxy Statement stated the following about Defendant Fulton:

> *Diane Fulton*, 63, has served on our Board of Directors since December 2015. From September 2008 to July 2016, Ms. Fulton was the Vice President and Chief Investment Officer of the Vancouver Foundation, Canada's largest community foundation. Prior to that, Ms. Fulton spent nine years at The University of British Columbia, as the Executive Director, Investments, and 12 years at ScotiaMcLeod Inc., a division of Scotia Capital Inc., most recently as Director and Vice President of Corporate Finance. Ms. Fulton currently serves on the boards of directors of Ten Peaks Coffee Company (TSX: TPK) and the University of British Columbia Investment Management Trust and served on the board of directors of Insurance Corporation of British Columbia from 2004 to 2010, and Pacific Northern Gas Limited (TSX: PNG) from 2005 until its acquisition by Altagas Ltd. in 2011. Ms. Fulton also serves as an advisor to the investment committee of the Insurance Corporation of British Columbia. Ms. Fulton holds a Masters of Business Administration from York University and a Bachelor's Degree in Mathematics from the University of Toronto and is an accredited director in the Institute of Corporate Directors (ICD). Ms. Fulton brings to the Board a breadth of finance and investment skills, as well as public company board experience.

**Defendant D. Pearce**

51. Defendant Douglas Pearce ("D. Pearce") has served as a Company director since January 2016, and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of April 18, 2017, Defendant D. Pearce beneficially owned 10,532 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $3.70, D. Pearce owned approximately $38,968 worth of CPI stock.

---

[4] This figure includes 8,000 shares of common stock held by Ms. Fulton's husband.

52.    For the fiscal year ended December 31, 2016, Defendant D. Pearce received
$132,918 in compensation from the Company, comprised of $66,250 in fees paid or earned in
cash, and $66,668 in fees earned or paid in stock.

53.    The Company's 2017 Proxy Statement stated the following about Defendant D.
Pearce:

> *Douglas Pearce*, 64, has served on our Board of Directors since January 2016. Mr.
> Pearce was the founding Chief Executive Officer and Chief Investment Officer of
> the British Columbia Investment Management Corporation (bcIMC), one of
> Canada's largest institutional money managers. Mr. Pearce led the organization
> from 1988 until he retired in June 2014. Mr. Pearce has also served as director and
> Chair of the Canadian Coalition for Good Governance (CCGG), the Pacific Pension
> Institute (PPI), and the Pension Investment Association of Canada (PIAC). Mr.
> Pearce was a member of the Faculty Advisory Board at the University Of British
> Columbia Sauder School Of Business and the Advisory Board at the Forum for
> Women Entrepreneurs. Mr. Pearce received his Bachelor of Commerce degree
> from the University of Calgary and is an accredited director in the Institute of
> Corporate Directors (ICD).   Mr. Pearce brings to the Board a wealth of investment
> and corporate governance experience.

**Defendant R. Pearce**

54.    Defendant Robert Pearce ("R. Pearce") has served as a Company director since
2007, and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of
April 18, 2017, Defendant R. Pearce beneficially owned 395,522 shares of the Company's
common stock. Given that the price per share of the Company's common stock at the close of
trading on April 18, 2017 was $3.70, R. Pearce owned approximately $1,463,431 worth of CPI
stock.

55.    For the fiscal year ended December 31, 2016, Defendant R. Pearce received
$149,586 in compensation from the Company, comprised of $78,750 in fees paid or earned in
cash, and $70,836 in fees earned or paid in stock.

56.    During the period of time when the Company materially misstated information to
keep the stock price inflated, and before the scheme was exposed, Defendant R. Pearce sold 2,758

shares of Company stock in the IPO, from which he benefited in the amount of approximately $216,201. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

57.     The Company's 2017 Proxy Statement stated the following about Defendant R. Pearce:

> *Robert Pearce*, 62, has served on our Board of Directors since 2007. Mr. Pearce also serves on the board of directors of Canada Guaranty Mortgage Insurance Company and First American Payments Systems. Mr. Pearce spent 26 years with BMO Bank of Montreal, from 1980 to 2006, most recently holding the position of Chief Executive Officer and President, Personal and Commercial Client Group. He also served on the board of directors of MasterCard International from 1998 to 2006 and as Chairman of the Canadian Bankers' Association from 2004 to 2006. Mr. Pearce holds a Bachelor of Arts from the University of Victoria and a Master of Business Administration from the University of British Columbia. Mr. Pearce brings to the Board more than 30 years of operational and leadership experience in the financial services industry, including extensive operating experience in credit card, debit card and prepaid cards in both card issuing and merchant acceptance in Canada and the United States.

**Defendant Peters**

58.     Defendant Nicholas Peters ("Peters") has served as a Company director since 2007.

59.     The Company's 2017 Proxy Statement stated the following about Defendant Peters:

> *Nicholas Peters*, 44, has served on our Board of Directors since 2007. Mr. Peters is a Managing Director at Parallel49 Equity (formerly Tricor Pacific Capital) a private equity firm that makes control investments in lower middle market companies in the United States and Canada, which he joined in 2002, and also began serving as Parallel49 Equity's Chief Financial Officer in 2012. Prior to joining Parallel49 Equity, Mr. Peters was a Senior Manager at Arthur Andersen LLP in Chicago. Mr. Peters is the Chairman of BFG Supply Company LLC, Questco and Certified Recycling and has served on the board of several other Parallel49 Equity investment companies. Mr. Peters holds a Bachelor of Science degree in Business Administration from the University of Dayton in Ohio. He is a Certified Public Accountant and is affiliated with the American Institute of Certified Public Accountants and the Ohio Society of CPAs. Mr. Peters brings to the Board strong finance and accounting skills, as well as valuable experience from his oversight of

the management and operations of several of Parallel49 Equity's portfolio companies.

### Defendant Rowntree

60.     Defendant David Rowntree ("Rowntree") has served as a Company director since 2007.

61.     The Company's 2017 Proxy Statement stated the following about Defendant Rowntree:

> *David Rowntree*, 61, has served on our Board of Directors since 2007. Mr. Rowntree is the President and Chair of Highland West Capital Ltd., a Vancouver-based merchant bank that he founded in July 2012. Mr. Rowntree is one of the founders of Tricor Pacific Capital, where he served as a Managing Director from January 1996 to June 2013. Prior to co-founding Tricor, Mr. Rowntree was a practicing attorney in both public practice and as in-house counsel. Mr. Rowntree is the Chair of Ten Peaks Coffee Company (TSE:TPK). Mr. Rowntree holds a Bachelor of Arts from the University of British Columbia and a Bachelor of Law from the Osgoode Hall Law School in Toronto, Ontario. Mr. Rowntree brings to the Board more than three decades of public and private investment expertise as well as experience in corporate governance, strategic planning and risk mitigation and assessment.

### Defendant Seaman

62.     Defendant Bradley Seaman ("Seaman") has served as a Company director since 2007 and is currently Chairman of the Board.

63.     The Company's 2017 Proxy Statement stated the following about Defendant Seaman:

> *Bradley Seaman*, 57, has served on our Board of Directors since 2007 and currently serves as Chairman of the Board. Mr. Seaman has been employed, since August 1999, by Parallel49 Equity and its predecessor by name, Tricor Pacific Capital. From 1999 through December 2011, Mr. Seaman was Parallel49 Equity's Managing Director and leader of its U.S. operations, and, since January 2012, has served as its Managing Partner, responsible for leading overall firm operations, strategy, funding and investments. Prior to joining Parallel49 Equity, and from 1990 through July 1999, Mr. Seaman was employed by GE Capital Corporation where he held a number of increasingly senior positions in GE's Transportation & Industrial Funding and Commercial Finance units. In 1994, Mr. Seaman was

selected to be part of a new group that was established to focus GE Capital's debt and equity products on the emerging private equity market, and, in that capacity, headed GE's offices in New York and Chicago. Mr. Seaman is also a member of the board of directors of Steel Dynamics, Inc. (NASDAQ: STLD). Mr. Seaman holds a Bachelor of Science degree in Business Administration from Bowling Green State University and a Master of Business Administration from the University of Dallas. He brings to the Board a comprehensive understanding and experience in the capital markets, management experience, and both operational and corporate governance experience drawn from his involvement in the management and oversight of Parallel49 Equity's portfolio companies.

### Trico Fund Defendants

64.     Defendant Tricor Pacific Capital Partners (Fund IV), Limited Partnership ("Tricor Fund IV") owned 21.8 million shares, or 52.6%, of CPI common stock, prior to the IPO.

65.     Tricor Pacific Capital Partners (Fund IV) US, Limited Partnership ("Tricor Fund IV US") owned 12.9 million shares, or 31.1%, of CPI common stock prior to the IPO.

66.     Defendants Tricor Fund IV and Tricor Fund IV US are both managed by Defendant Tricor Pacific Capital, Inc. ("Tricor Pacific," and together with Tricor Fund IV and Tricor Fund IV US, the "Tricor Fund Defendants"), a private equity firm with offices in Lake Forest, Illinois and Vancouver, British Columbia.

67.     The Tricor Fund Defendants collectively owned approximately 90.9% of CPI's outstanding preferred stock prior to the IPO.

68.     Defendants Seaman, Peters, and Rowntree, each of whom are officers or members of Tricor Pacific and served on CPI's Board of Directors at the discretion of Tricor Pacific, comprised three of the five members of CPI's Board at the time of the IPO.

69.     The Tricor Fund Defendants sold 1,899,605 shares of CPI stock in the IPO, receiving approximately $18 million in proceeds. Following the IPO, the Tricor Fund Defendants continued to own approximately 57.5% of CPI common stock.

70.     According to the Registration Statement, CPI intended to use part of the IPO's proceeds to redeem the Tricor Fund Defendants' preferred stock for approximately $10.7 million and pay Defendant Montross $4,775,832 to settle his awards under the CPI Acquisition, Inc. Phantom Stock Plan. These payments were made on October 15, 2015.

71.     By virtue of their stock ownership and their designation of the majority of the members of the CPI Board, and stated in the Registration Statement, the Tricor Fund Defendants controlled CPI at the time of the IPO.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS
## AND TRICOR FUND DEFENDANTS

72.     By reason of their positions as officers, directors, and/or fiduciaries of CPI and because of their ability to control the business and corporate affairs of CPI, the Individual Defendants and Tricor Fund Defendants owed CPI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CPI in a fair, just, honest, and equitable manner. The Individual Defendants and Tricor Fund Defendants were and are required to act in furtherance of the best interests of CPI and its shareholders so as to benefit all shareholders equally.

73.     Each director, officer, and controller of the Company owes to CPI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants and Tricor Fund Defendants, because of their positions of control and authority as directors, officers, and/or controllers of CPI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers, directors, and controllers of CPI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.     Each Individual Defendant and Tricor Fund Defendant, by virtue of his, her, or its position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants and Tricor Fund Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of CPI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants and Tricor Fund Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants and Tricor Fund Defendants who were also officers, directors, and/or controllers of the Company has been ratified by the remaining Individual Defendants who collectively comprised CPI's Board at all relevant times.

77.     As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants and Tricor Fund Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business,

prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.     To discharge their duties, the officers and directors of CPI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of CPI were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to CPI's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how CPI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of CPI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CPI's operations would comply with all

applicable laws and CPI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)       exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)       refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)       examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79.       Each of the Individual Defendants and Tricor Fund Defendants further owed to CPI and the shareholders the duty of loyalty requiring that each favor CPI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

80.       At all times relevant hereto, the Individual Defendants were the agents of each other and of CPI and were at all times acting within the course and scope of such agency.

81.       Because of their advisory, executive, managerial, directorial, and controlling positions with CPI, each of the Individual Defendants and Tricor Fund Defendants had access to adverse, non-public information about the Company.

82.       The Individual Defendants and Tricor Fund Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the

wrongful acts complained of herein, as well as the contents of the various public statements issued by CPI.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83.     In committing the wrongful acts alleged herein, the Individual Defendants and Tricor Fund Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and Tricor Fund Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants and Tricor Fund Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

84.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' and Tricor Fund Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

85.     The Individual Defendants and Tricor Fund Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and Tricor Fund Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of CPI was a direct, necessary, and substantial

participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

86.     Each of the Individual Defendants and Tricor Fund Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Tricor Fund Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CPI, and was at all times acting within the course and scope of such agency.

## CPI'S CODE OF ETHICS

88.     The Company's Code of Ethics and Business Conduct (the "Code of Ethics"), "is a statement of the Company's business practices and applies to all trustees, directors, officers and Employees of the Company. Consultants, contractors and agents retained by the Company shall conduct themselves in accordance with this Code in their activities relating to the Company."

89.     The Code of Ethics provides, as to "Compliance with Laws," that "[t]he Company will conduct its business in compliance with all applicable laws, regulations and other legal requirements. We must, at all times, abide by the law and respect its intent in the best interests of the Company, our customers, suppliers, Employees and other stakeholders."

90.     The Code of Ethics provides, as to "Insider Trading," that:

Insider trading may occur when you know material non-public information about any entity with which the Company has a business relationship, and you trade that entity's securities, such as stocks or bonds, while in possession of that information

or tell others about it before it is made public. Securities laws prohibit insider trading and prohibit any employee from informing another person of any "material non-public" or "insider" information which has not been generally disclosed to the public ("tipping").

91.     The Code of Ethics provides, with respect to violations thereof, that those subject to the Code "are obligated to promptly report any problems or concerns or any potential or actual violation of the Code."

92.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act. Several of the Individual Defendants violated the code by selling shares in the IPO while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' AND TRICOR FUND DEFENDANTS' MISCONDUCT

### Background

93.     CPI is "a leading provider of integrated Financial Payment Card solutions in North America" whose customer base primarily consists of "leading national and regional banks, independent community banks, credit unions, managers of prepaid debit programs, Group Service Providers and card processors."

94.     As defined by the Company, financial payment cards are "credit, debit and Prepaid Debit Cards issued on the networks of the Payment Card Brands (Visa, MasterCard, American Express and Discover) and Interac (in Canada)."

95.     At the time of the IPO, CPI claimed to be the largest provider of financial payment cards in North America with a market share of 35%.

96.     As a result of this market share, the Company asserted in its Prospectus that it "has long-standing trust-based relationships with [its] key customers and often deep process and technology integration."

97.     EMV cards, more commonly known as "chip" cards, store data on integrated chips, whereas magnetic stripe cards store data on magnetic stripes. Many EMV cards have both a chip and a magnetic stripe to accommodate older systems.

98.     EMV cards may be either contact cards, which must be physically inserted into a reader, or Dual-Interface, which allows the card to be read over a short distance using radio-frequency identification ("RFID") technology.

99.     Magnetic stripe cards, while more efficient at point of sale, present a number of security flaws. The data on a magnetic stripe can be read and written onto a new card, or "pirated," by thieves employing black market technologies. The new, pirated, card could then be used to make fraudulent purchases.

100.    EMV cards offer enhanced security compared to magnetic stripe cards. EMV cards employ a dynamic code unique to each particular transaction, obviating the need to transmit card numbers and expiration dates from customer to merchant. Thus, the data potentially stolen in a given EMV transaction does not provide potential thieves the data necessary to create a pirated card.

101.    Although EMV technology was developed in the early 1990s, the United States has moved toward adoption of it in the last several years, lagging behind the rest of the developed world.

102.    Adoption of EMV technology began at scale during the latter half of 2014, and according to the Company's Form 10-K filed with the SEC on March 24, 2016, is "expected to continue over the next several years."

103.    The Company's Prospectus listed four factors contributing to the ongoing migration to EMV: (1) the "Liability Shift"; (2) escalating credit card fraud in the U.S. combined with the enhanced security provided by EMV; (3) high-profile data breaches; and (4) a desire for global interoperability of payment systems.

104.    The "Liability Shift" refers to a change in liability for fraud in the U.S. which began on October 15, 2015 -- mere days before CPI's IPO. The previous liability regime provided that card issuers were liable for financial losses arising from fraudulent use of cards. Under the post liability-shift regime, merchants are liable for fraud stemming from transactions on systems that do not support EMV, where the issuer has issued EMV-enabled cards to customers and the merchant has not adopted EMV technology. The purpose of the Liability Shift was to motivate the rapid adoption of EMV technology by issuers and merchants.

105.    According to The Nilson Report, the United States accounts for a disproportionate share of fraudulent card transactions worldwide, as compared to its share of total worldwide card transactions.

106.    Many U.S. merchants and banks, as well as at least one credit reporting bureau, have reported major customer or client data breaches, as well as related fraudulent activity, in

recent years. This has raised awareness about data security and increased demand for greater security, including the adoption of EMV payment systems.

107.    As the last developed country to adopt EMV, adoption of the technology in the United States represents a move toward standardized payment systems around the world, allowing customers to use their cards worldwide in a consistent fashion.

### CPI's Accumulation of Unsold EMV Cards

108.    Due to CPI's position in the financial card market, the Company viewed itself as being "well-positioned to capitalize on the U.S. market conversion to EMV."

109.    In order to take advantage of its market position and the move toward EMV, CPI "made significant investments in [its] physical infrastructure and equipment platform to prepare for the EMV conversion including opening a dedicated EMV technology center in Colorado for EMV production and personalization and significant information technology, human capital and equipment upgrades across our network of facilities."

110.    The Company boasted of its strong sales growth and revenue related to the sale of EMV cards leading up to the IPO.

111.    CPI maintained "enterprise resource planning" software, called Monarch, which permitted the Company to have instant access to view production schedules, order information, shipping information, and inventory levels for each CPI facility. This information was available to management and could be utilized to generate company-wide reports using Crystal Reports software.

112.    CW-1,[5] who served as an inventory analyst at the Company's Nashville, Tennessee personalization and fulfillment center during the months immediately prior to and following the IPO, personally witnessed the rapid pile-up of unsold EMV cards -- which resulted in literal piles of blank cards being stored on employees' desks due to lack of storage space. Such storage presented a security risk as the blank cards could be made into any financial payment card.

113.    CW-1 stated that in the time before the IPO, "millions upon millions" of unsold cards, roughly half of which were EMV cards, were accumulating at the Nashville facility, which received blank cards from CPI production centers and printed information on them.

114.    CW-1 stated that in October 2015, the vault in the Nashville facility had to be expanded by an additional 3,000 square feet to accommodate the growing number of unsold cards accumulating at the facility. CW-1 explained further that all of the Company's facilities were overrun with unsold cards, necessitating vault expansions at other CPI facilities.

115.    The pattern of overstocking was clear to CW-1: "The amount of cards that [Nashville] sent out versus the amount of cards that were coming in [to the Nashville facility] didn't match up."

116.    EMV cards accounted for 37% of CPI's net sales in the twelve months leading up to June 30, 2015.

**IPO**

117.    On or about May 14, 2015, CPI filed a registration statement on Form S-1 with the SEC, for the IPO.

---

[5] An anonymous witness is identified herein with the designation "CW-1," and all such references to an anonymous witness are drawn from the Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed in the Securities Class Action on October 17, 2016, which is attached as Exhibit A hereto, and corresponds to the same referenced witness therein.

118.    Over the next few months, the Registration Statement was amended several times, ultimately being declared effective by the SEC on October 8, 2015.

119.    CPI, along with those firms underwriting the IPO, filed the Prospectus on October 9, 2015, which became part of the Registration Statement.

120.    On or about October 25, 2016, the Company completed its IPO, in which it sold 17,250,00 shares of common stock for a price per share to the public of $10.00. CPI received aggregate proceeds of approximately $164 million from the IPO, net of underwriters' discounts and commissions. Of the shares sold, 2.25 million were sold by certain stockholders of the Company, including Defendants Montross, R. Pearce, and Dreiling.

**False and Misleading Statements**

*The Registration Statement*

121.    The Registration Statement, declared effective by the SEC on October 8, 2015, contained a number of false and misleading statements regarding the Company, its management, operations, financial performance, growth prospects, and the relevant market. The Registration Statement was personally signed by Defendants Montross, Brush, and Dreiling, and by Defendant Montross as attorney-in-fact for Defendants Seaman, Peters, R. Pearce, and Rowntree.

122.    The Registration Statement made numerous statements designed to bolster investor confidence in CPI's sales and market position at the time of the IPO. For instance, the Registration Statement stated:

> *Leading Market Position with Long-Term Customer Relationships.* We estimate that we produce approximately 35% of all Financial Payment Cards in the United States, which we believe gives us the #1 market position by unit volume. We are a trusted partner across the markets we serve and believe we have the #1 position in the U.S. prepaid debit market (which represents the fastest growing subset of the Financial Payment Card market in the United States), serving the top five U.S. Prepaid Debit Card program managers, a leading position in the U.S. large issuer market, serving the majority of the top 20 U.S. debit and credit card issuers, and the #1 position in the highly attractive U.S. small issuer market, which includes

independent community banks and credit unions, driven by our strong relationships, capabilities and technologies. As a market leader, CPI has long-standing trust-based relationships with our key customers and often deep process and technology integration, particularly in the case of customers who utilize our card services and instant issuance systems and services. The solutions that we provide require strict data integrity, and generally card issuers are reluctant to switch away from trusted providers due to the requirements for high-security and access to highly-sensitive cardholder information. As a result, our customers are selective about the partners with which they work and typically seek out partners who have a well-established reputation for trust and quality and are able to meet their service requirements.

We serve a diverse set of over 4,000 direct and indirect customers, including many of the largest North American issuers of debit and credit cards such as JPMorgan Chase, Bank of America, American Express and Wells Fargo, as well as the largest global managers of Prepaid Debit Card programs, including InComm, Green Dot, Blackhawk Network and American Express. We have long-standing relationships with our customers, many of whom we have served for decades and provide a differentiated level of service. We also maintain important relationships with the Payment Card Brands to ensure our facilities and processes consistently meet their standards.

123.    Further, the Registration Statement provided financial results for the eighteen

months prior to June 30, 2015, stating, in relevant part:

For the six months ended June 30, 2015, we generated net sales of $172.8 million, which represented an increase of 80.5% as compared to the six months ended June 30, 2014, net income from continuing operations of $18.1 million, which represented an increase of 408.0% compared to the six months ended June 30, 2014 and Adjusted EBITDA of $41.9 million, which represented an increase of 183.6% compared to the six months ended June 30, 2014, representing net income from continuing operations and Adjusted EBITDA margins of 10.5% and 24.2%, respectively. For the year ended December 31, 2014, we generated $261.0 million of net sales, which represented an increase of 32.9% as compared to the prior year, $16.0 million of net income from continuing operations, which represented an increase of 42.6% as compared to the prior year, and $54.2 million of Adjusted EBITDA, which represented an increase of 41.3% as compared to the prior year, and net income from continuing operations and Adjusted EBITDA margins of 6.1% and 20.8%, respectively.

124.    In a section titled "Trends and Key Factors Affecting or Financial Performance,"

the Registration Statement noted, in pertinent part:

*EMV Conversion in the United States*

29

***

During the six months ended June 30, 2015, we produced and shipped 75.2 million EMV cards, as compared to 13.9 million during the six months ended June 30, 2014. During 2014, we produced and shipped 63.8 million EMV cards, as compared to 6.8 million during 2013. Of the 63.8 million EMV cards we shipped in 2014 (17.7% of the total Financial Payment Cards we shipped in 2014), over 50 million were shipped in the second half of 2014. We believe that demand for EMV cards increased sharply in the second half of 2014 primarily as a result of, among other things, the impending Liability Shift and occurrence of high-profile data breaches. . . . We anticipate that this trend will continue and that an increasing number and proportion of the Financial Payment Cards that we ship in the future will be EMV Cards.

125.   In the same subsection, CPI noted that it had experienced "significant changes to

[its] financial profile" due to the market shift toward EMV cards, noting, specifically:

- Increased Net Sales—The conversion of non-EMV cards to EMV cards has driven growth in our net sales because EMV cards have a higher selling price than comparable magnetic stripe cards.

- Increased Cost of Goods Sold—The conversion of magnetic stripe cards to EMV cards also drove increases in our cost of goods sold as EMV cards include an integrated circuit chip assembly and may also include an RFID inlay assembly, in the case of a Dual-Interface EMV card, which meaningfully increased our cost of goods sold.

- Increased Gross Profit and Gross Profit Margin—The conversion of magnetic stripe cards to EMV cards also drove an increase in our gross profit, as the gross profit generated by an EMV card is higher than the gross profit generated by an otherwise comparable magnetic stripe card. Likewise, the conversion of magnetic stripe cards to EMV cards resulted in an increase to our gross profit margins.

- Increased Income from Operations and Operating Margin—The conversion of magnetic stripe cards to EMV cards drove an increase in our income from operations, as the increased operating expenses required to support the increased production of EMV cards was less than the incremental gross profit generated. These factors drove an increase in our operating margin.

- Increased Working Capital Investment—The conversion of magnetic stripe cards to EMV cards resulted in increased investment in working capital, particularly accounts receivable and inventory. This is a direct result of the increased levels of net sales and cost of goods sold discussed above.

- Increased Capital Spending and Depreciation—We incurred elevated levels of capital investment to prepare for the U.S. EMV conversion, including

investments in our network of facilities and technological infrastructure discussed above. We anticipate spending up to an additional $10 million in capital investment during 2015 in connection with our further EMV preparation. This will utilize cash from our operations and result in additional depreciation expense in future years.

126.    CPI further detailed its "Growth Strategy," a key component of which was the U.S. conversion to EMV, in the Registration Statement as follows:

Capitalize on U.S. EMV Conversion.  The conversion to the EMV standard in the United States is expected to increase the size (measured in dollars) of the Financial Payment Card market (excluding services) from $180 million in 2013 to $1.2 billion by 2019, driven primarily by the increasing levels of card fraud in the United States, the Payment Card Brands' coordinated EMV conversion plan, including the liability shift scheduled for October 1, 2015, and the need for a single global interoperable standard of card acceptance. The conversion of Financial Payment Cards in the United States from magnetic stripe technology to the EMV standard began in earnest in the second half of 2014 and is expected to continue over the next several years, with full adoption in the credit and bank debit card markets expected to be largely complete by 2017 and increasing levels of adoption of Prepaid Debit Cards and Private Label Credit Cards beyond 2017. We believe the conversion to EMV, and subsequently the expected further adoption of the more complex and higher priced Dual-Interface EMV cards, will increase the size (measured in dollars) of our estimated addressable card market by four times over the next decade. In anticipation of the EMV conversion, we invested significantly in our network of facilities (the most extensive in North America), technological infrastructure and human capital resources. We believe our comprehensive solutions offering and proven track record ideally positions us to be our customers' partner of choice to successfully complete the EMV conversion.

127.    With regard to "potential" risks, the Registration statement noted:

Our operating results may vary significantly from quarter to quarter and annually, and may differ significantly from our expectations or guidance.

Our operating results are affected by a wide variety of factors that could materially and adversely affect revenues and profitability or lead to significant variability in our operating results. These factors include, among others, the cyclicality of the financial card and electronic payment industries, capital requirements, inventory management, the availability of funding, competition, new product developments, technological changes and production problems. For example, if anticipated sales or shipments do not occur when expected, expenses and inventory levels in a given quarter can be disproportionately high, and our results of operations for that quarter, and potentially for future quarters, may be adversely affected. In addition, our effective tax rate currently takes into

consideration certain favorable tax rates and incentives which, in the future, may not be available to us.

A number of other factors could lead to fluctuations in quarterly and annual operating results, including:

- order cancellations or rescheduling by customers;
                                    ***
- changes in distribution and sales arrangements; [and]
- the failure to win new projects;
                                    ***

Unfavorable changes related to certain of the above factors have in the past and any of the above factors may in the future adversely affect our operating results. Furthermore, in periods of industry overcapacity or when our key customers encounter difficulties in their end-markets, orders are more exposed to cancellations, reductions, price renegotiations or postponements, which in turn reduce our management's ability to forecast the next quarter or full-year production levels, net sales and margins. For these reasons, our net sales and operating results may differ materially from our expectations or guidance as visibility is reduced and have an adverse effect on our business, financial condition and results of operations.

128.    CPI further described certain risks associated with price erosion as potential, when in reality such trends had manifested at the time of the IPO. In relevant part, the Registration Statement stated:

> ***The financial payment card industry may be subject to price erosion, which could have an adverse effect on our business.***
> One of the results of the rapid innovation in the financial payment card industry is that pricing pressure can be intense, in particular for large credit and debit card issuers and large card processors. Our large credit and debit card issuer customers face continued competitive pressure. As these issuers seek to reduce their expenses, we, in turn, may experience a decline in the prices at which our products can be sold and at which such services can be offered. In such instances, in order to continue to supply these products and services at competitive prices, we must reduce our production costs. Typically, we are able to accomplish this through leveraging our scale and production efficiencies. However, if we cannot continue to improve our efficiencies to a degree sufficient for maintaining the required margins, we may no longer be able to make a profit from the sale of these products and services. Moreover, we may not be able to cease production of such products, either due to our ongoing contractual obligations or the risk of losing our existing customer relationships, and as a result may be required to bear a loss on such products. Further competition in our core product and service markets may lead to price erosion, lower revenue growth rates and lower margins in the future. Should reductions in our production costs fail to keep pace with reductions in market prices

for the products we sell, there could be an adverse effect on our business, financial condition and results of operations.

129.    With respect to the risk of lower-cost EMV card producers moving into the market

and increasing competition, the Registration Statement noted:

*We face competition that may result in a loss of our market share and/or a decline in our profitability.*

***

Some of our competitors have longer operating histories, and, when viewed globally, larger customer bases and significantly greater financial, sales and marketing, manufacturing, distribution, technical and other capabilities than we do. These competitors may be able to adapt more quickly to new or emerging technological requirements and changes in customer and/or regulatory requirements. They may also be able to devote greater resources to the promotion and sale of their products and services. We also face competition from newly established competitors, suppliers of products and customers who choose to develop their own products and services.

***

As the technological sophistication of our competitors and the size of the market increase, competing low-cost producers could emerge and grow stronger. If our customers prefer low-cost alternatives to our products, our revenues and profitability could be adversely affected. Increased competition has historically resulted in, and is likely to continue to result in, declining average selling prices and reduced gross margins in certain of our businesses and the loss of market share in certain markets. We may not be able to continue to compete successfully against current or new competitors. If we fail to compete successfully, we may lose market share in our existing markets, which could have an adverse effect on our business, financial condition and results of operations.

130.    CPI made the following statements regarding "potential" risks associated with a

decline in business from its large customers, or CPI's failure to retain such customers:

*Failure to identify, attract and retain new customers or a failure to maintain our relationships with our major customers could adversely affect our business.*

Our business is dependent upon our ability to identify, attract and retain new customers and to maintain our relationships with our existing customers. A decline in the business of our large customers or a failure to retain such customers may adversely affect our business, financial condition and results of operations.

A substantial portion of our net sales is derived from several large customers. Our top five customers as of December 31, 2014 accounted for approximately 33.9% of our pro forma net sales (37.8% of our reported net sales) for the year ended December 31, 2014, and our top customer accounted for approximately

10.1% of our pro forma net sales (11.3% of our reported net sales) for the same period. Our continued business relationship with these customers, and the renewal of key contracts by major customers, may be impacted by several factors beyond our control, including more attractive product offerings from our competitors, pricing pressures or the financial health of these customers. Many of our key customers operate in competitive businesses, and their demand and market positions may vary considerably.

***

Therefore, we may not be able to maintain our market share with our key customers, which in turn could affect the revenue streams upon which we currently rely. Furthermore, there is no guarantee that we will be able to renew or win significant contracts in a given year. If we were to lose important programs for our products with any of our key customers, or if any key customer were to reduce or change its contract, seek alternate suppliers, increase its product returns or become unable or otherwise fail to meet its payment obligations, our business, financial condition and results of operations could be materially adversely affected.

131. Similarly, the Company made statements characterizing risks associated with lower than anticipated adoption rates for EMV as *potential*, when such trends had begun to manifest at the time of the IPO. For example, the Registration Statement stated, in relevant part:

**The adoption of EMV technology and dual-interface capability in the United States may not be as rapid or widespread as we anticipate, which could adversely affect our growth.**

We have made significant investments in our North American EMV production capabilities. In particular, in 2014, we opened a 50,000 square foot technology center in Colorado dedicated to EMV production and personalization and enhanced our EMV capabilities across our network. Our ability to grow depends significantly on whether U.S. card issuing banks incorporate EMV technology as part of their new technological standards and, following the initial conversion to EMV, whether such banks issue Dual-Interface EMV cards. Banks may be delayed in transitioning to the issuance of EMV cards or Dual-Interface EMV cards due to increased costs and other factors. If these entities do not continue to deploy EMV and Dual-Interface EMV technology or deploy such technology less quickly and/or completely than we expect, the consequence could have an adverse effect on our business, financial condition and results of operations.

132. CPI considered the growth in EMV cards to be critical to itself and its investors, as evidenced by the express breakdown of EMV cards shipped since June 2012:

| Other Data: | Six Months Ended June 30, 2015 | Twelve Months Ended June 30, 2015 | 2014 | Year Ended December 31, 2014 | 2013 | 2012 |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| Financial Payment Card Shipments | | | | | | |
| EMV | 75,164 | 13,921 | 125,088 | 63,845 | 6,769 | 5,015 |
| Non-EMV | 111,240 | 157,018 | 251,607 | 297,385 | 297,862 | 323,817 |
| Total | 186,404 | 170,939 | 376,695 | 361,230 | 304,631 | 328,832 |

133.  This shipment data was relevant as the Company's practice is to recognize revenue on sales upon shipment, except in those circumstances where it has entered into "bill and hold" arrangements with a customer.

134.  The Company also included in its Registration Statement a number of financial measures which suggested that CPI was poised for continued growth, while omitting to state facts that demonstrated that these trends were not sustainable.

135.  As of June 30, 2015, CPI's net sales of products increased 91.4%, or $53.8 million, and net income increased $17.5 million -- a commendable 2,190.9% -- for the prior six-month period as compared to the same six-month period ended June 30, 2014:

| | Six Months Ended June 30, 2015 | 2014 | $ Change | % Change |
|---|---|---|---|---|
| | | (dollars in thousands) | | |
| Net sales: | | | | |
| Products | $ 112,771 | $ 58,905 | $ 53,866 | 91.4% |
| Services | 60,075 | 36,862 | 23,213 | 63.0% |
| Total net sales | 172,846 | 95,767 | 77,079 | 80.5% |
| Cost of sales | 111,503 | 69,969 | 41,534 | 59.4% |
| Gross profit | 61,343 | 25,798 | 35,545 | 137.8% |
| Operating expenses | 29,959 | 16,262 | 13,697 | 84.2% |
| Income from operations | 31,384 | 9,536 | 21,848 | 229.1% |
| Other income (expense): | | | | |
| Interest, net | (3,505) | (3,444) | (61) | 1.8% |
| Foreign currency gain (loss) | 149 | (211) | 360 | (170.6)% |
| Other income | 61 | 19 | 42 | 221.1% |
| Income before taxes | 28,089 | 5,900 | 22,189 | 376.1% |
| Provision for income taxes | (9,974) | (2,334) | (7,640) | 327.3% |
| Net income from continuing operations | 18,115 | 3,566 | 14,549 | 407.9% |
| Loss from discontinued operations, net of taxes | (606) | (2,763) | 2,157 | 78.1% |
| Gain on sale of discontinued operations, net of taxes | 887 | — | 887 | — |
| Net income | $ 18,396 | $ 803 | $ 17,593 | 2,190.9% |

136.    Comparing the same periods, net sales of products in the U.S. Debit and Credit segments increased 120.8%, or $56.4 million:

| Six Months Ended June 30, | | | | |
|---|---|---|---|---|
| | 2015 | 2014 | $ Change | % Change |
| | | (dollars in thousands) | | |
| **Net sales by segment:** | | | | |
| U.S Debit and Credit segment—Products | $    103,161 | $    46,727 | $    56,434 | 120.8% |
| U.S Debit and Credit segment—Services | 20,244 | 2,543 | 17,701 | 696.1% |
| U.S Debit and Credit segment—Total | 123,405 | 49,270 | 74,135 | 150.5% |
| U.S. Prepaid Debit segment—Products | — | — | — | — |
| U.S. Prepaid Debit segment—Services | 29,823 | 23,298 | 6,525 | 28.0% |
| U.S. Prepaid Debit segment—Total | 29,823 | 23,298 | 6,525 | 28.0% |
| U.K. Limited segment—Products | 9,231 | 11,142 | (1,911) | (17.2)% |
| U.K. Limited segment—Services | 4,687 | 5,188 | (501) | (9.7)% |
| U.K. Limited segment—Total | 13,918 | 16,330 | (2,412) | (14.8)% |
| Other—Products | 4,818 | 5,177 | (359) | (6.9)% |
| Other—Services | 5,104 | 6,006 | (902) | (15.0)% |
| Other—Total | 9,922 | 11,183 | (1,261) | (11.3)% |
| Inter-company eliminations | (4,222) | (4,314) | 92 | (2.1)% |
| Total | $    172,846 | $    95,767 | $    77,079 | 80.5% |

137.    The Registration Statement noted that this "increase in net sales was driven by an increase in EMV related revenue."

138.    Gross profit increased by 217.7% in the Company's U.S. Debit and Credit segment during the six months ended June 30, 2015, "driven by the increased level of net sales," as demonstrated by the following table from the Registration Statement:

| Six Months Ended June 30, | | | | | |
|---|---|---|---|---|---|
| | 2015 | % of net sales | 2014 | % of net sales | $ Change | % Change |
| | | | (dollars in thousands) | | | |
| **Gross profit by segment:** | | | | | | |
| U.S Debit and Credit segment | $    45,307 | 36.7% | $    14,260 | 28.9% | $    31,047 | 217.7% |
| U.S. Prepaid Debit segment | 11,297 | 37.9% | 7,078 | 30.4% | 4,219 | 59.6% |
| U.K. Limited segment | 3,368 | 24.2% | 3,375 | 20.7% | (7) | (0.2)% |
| Other | 1,371 | 24.1% | 1,085 | 15.8% | 286 | 26.4% |
| Total | $    61,343 | 35.5% | $    25,798 | 26.9% | $    35,545 | 137.8% |

139.    These favorable metrics served to show potential investors that the Company was poised "to capitalize on the U.S. market conversion to EMV." However, the Registration Statement

failed to disclose facts demonstrating adverse, observable trends that threatened to derail the Company's continued growth.

140.    Specifically, these statements in the Registration Statement were materially false and misleading because they failed to disclose that: (1) at the time of the IPO, CPI's biggest customers had significant excess inventory of EMV cards as a result of those customers purchasing more cards than they were issuing in the period leading up to the IPO; (2) CPI itself had been experiencing a rapid accumulation of unsold EMV cards, necessitating the expansion of its vaults in order to securely store this inventory; (3) small and mid-size issuers, which represent a significant part of CPI's business, were slow to adopt EMV technology; (4) the Company was experiencing increased pricing pressure due to competition in the sale of EMV cards; (5) as a result of the foregoing, the growth experienced prior to the IPO could not reasonably be expected to continue; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, CPI's public statements were materially false and misleading at all relevant times.

### The Truth Gradually Comes Out

#### *November 12, 2015 Press Release and Conference Call*

141.    On November 12, 2015, the Company issued a press release announcing its financial results for the third fiscal quarter ended September 30, 2015 ("Q3 2015").

142.    Later that same day, the Company held an earnings call. During the call, Defendant Montross stated that "EMV demand from our large issuers was slightly higher than we expected and, we believe, represented a modest pull forward of business into the [third] quarter" and away from the fourth quarter.

143.    The pull-forward involved sales that were expected to occur in the fourth quarter occurring instead in the third quarter, diminishing fourth quarter sales.

144.    In response to an analyst's questions regarding the pull forward, Defendant Montross stated that the pull forward had not been quantified, but the company "just noticed that . . . there was . . . a modest pull forward from the fourth quarter into the third quarter."

145.    The reported "modest pull forward" represented a continuation of a six-month trend of issuers accumulating a large inventory of EMV cards that accounted for months and months of issuances. The effect of this trend was that sales of cards would diminish in the future as issuers worked through the accumulated backlog.

146.    The Company's stock closed at $10.91 per share on November 13, a 7% drop from $11.74, where it had closed on November 12, 2015.

**The Failure to Disclose the Truth Continues**

***2015 3Q 10-Q***

147.    On November 23, 2015, the Company filed with the SEC a quarterly report on Form 10-Q for the quarter ending September 30, 2015 (the "2015 3Q 10-Q").

148.    The 2015 3Q 10-Q, which was signed by Defendant Brush, failed to disclose the following: (1) at the time of the IPO, CPI's biggest customers had significant excess inventory of EMV cards as a result of those customers purchasing more cards than they were issuing in the period leading up to the IPO; (2) CPI itself had been experiencing a rapid accumulation of unsold EMV cards, necessitating the expansion of its vaults in order to securely store this inventory; (3) small and mid-size issuers, which represent a significant part of CPI's business, were slow to adopt EMV technology; (4) the Company was experiencing increased pricing pressure due to competition in the sale of EMV cards; (5) as a result of the foregoing, the growth experienced prior to the IPO could not reasonably be expected to continue; (6) the Company failed to maintain

internal controls; and (7) as a result of the foregoing, CPI's public statements were materially false and misleading at all relevant times.

149.     Attached to the 2015 3Q 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Brush and Montross, attesting to the accuracy of the 2015 3Q 10-Q.

### The Truth Continues to Gradually Comes Out

*February 24, 2016 Conference Call*

150.     The Company held an earnings call on February 24, 2016 in which it disclosed that large issuers had increased their purchases throughout the first half of 2015 to levels far beyond card issuances, causing a buildup of inventory which would necessitate decreased demand as they worked through this backlog.

151.     In relevant part, Defendant Montross stated:

**After substantial purchases in the first half of 2015, many of the large issuers ease their pace of EMV card purchases through the second half of the year** as they began working toward catching up their EMV card issuance activity to their card purchases . . . We see this dynamic continuing into early 2016. **We have reasonably good visibility into the overall EMV demand by large issuers** in 2016 which gives us confidence in our growth projections for the year.

(Emphasis added).

152.     Further, the Company noted that its "reasonably good visibility into EMV demand" allowed it to project that this situation would continue into early 2016.

### The Failure to Disclose the Truth Continues

*2015 10-K*

153.     On March 24, 2016, the Company filed with the SEC an annual report on Form 10-K for the fiscal year ending December 31, 2015 (the "2015 10-K").

154.    The 2015 10-K, which was signed by, *inter alia*, Defendants Brush, Montross, Seaman, Fulton, D. Pearce, R. Pearce, Peters, and Rowntree, failed to disclose the following: (1) at the time of the IPO, CPI's biggest customers had significant excess inventory of EMV cards as a result of those customers purchasing more cards than they were issuing in the period leading up to the IPO; (2) CPI itself had been experiencing a rapid accumulation of unsold EMV cards, necessitating the expansion of its vaults in order to securely store this inventory; (3) small and mid-size issuers, which represent a significant part of CPI's business, were slow to adopt EMV technology; (4) the Company was experiencing increased pricing pressure due to competition in the sale of EMV cards; (5) as a result of the foregoing, the growth experienced prior to the IPO could not reasonably be expected to continue; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, CPI's public statements were materially false and misleading at all relevant times.

Attached to the 2015 10-K were certifications pursuant to the SOX signed by Defendants Brush and Montross, attesting to the accuracy of the 2015 10-K.

### The 2016 Proxy Statement

155.    On April 25, 2016, the Company filed with the SEC the 2016 Proxy Statement. The 2016 Proxy Statement, which was signed by Defendants Brush, Seaman, and Montross, failed to disclose the following: (1) at the time of the IPO, CPI's biggest customers had significant excess inventory of EMV cards as a result of those customers purchasing more cards than they were issuing in the period leading up to the IPO; (2) CPI itself had been experiencing a rapid accumulation of unsold EMV cards, necessitating the expansion of its vaults in order to securely store this inventory; (3) small and mid-size issuers, which represent a significant part of CPI's business, were slow to adopt EMV technology; (4) the Company was experiencing increased

pricing pressure due to competition in the sale of EMV cards; (5) as a result of the foregoing, the growth experienced prior to the IPO could not reasonably be expected to continue; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, CPI's public statements were materially false and misleading at all relevant times.

**The Truth Finally Emerges**

***May 11, 2016 Press Release and Conference Call***

156.    On May 11, 2016, CPI issued a press release announcing its financial results for the quarter ended March 31, 2016 ("Q1 2016"). That press release quantified the overstocking that had been occurring, and cut sales and earnings guidance for 2016.

157.    In the press release, Defendant Montross elaborated, stating, in relevant part:

> Based on discussions with customers and other market participants, including chip suppliers, it has become clear that two separate adverse trends have developed in the U.S. EMV card market that will delay into 2017 the anticipated growth in sales of EMV cards by the card manufacturers to the card issuers. First, the carryover into 2016 of unissued EMV card inventories at the large issuers and processors is much greater than anticipated, and accordingly, their EMV card purchases are being curtailed until inventories return to normal levels. Second, we are seeing evidence of slower than anticipated EMV conversions for the small to mid-sized issuers at the processor level, which leads us to expect a delay to 2017 of a portion of EMV card demand by this market segment that we had expected in 2016. As a result of these trends, we are reducing our full-year 2016 guidance range.

158.    The Company held an earnings call later that same day, in which Defendant Montross again discussed the overstocking of cards by issuers:

> First, the overstocking of EMV cards by the large issuers and processors in 2015, which we discussed in the previous earnings call as the reason for our outlook of relatively soft first half of 2016 for EMV sales is now known to be much greater than previously understood.
>
> The **carryover of unissued EMV card inventories into 2016 by the large issuers and processors which is now estimated to event an additional 50 to 100 million units or about 8% to 16% of total EMV card production demand in 2016 has left many large issuers and processors with at least three months' supply of excess inventory and in some cases more.**

The issuers and processors are now working through their excess card inventory positions and have been curtailing their purchases of additional EMV cards. We expect this trend to continue until the large issuers and processors right size their EMV card inventories. **We estimate that the negative revenue impact of CPI in 2016 from this reduction in current card demand will be approximately $35 million to $40 million compared to our original guidance for 2016**.

(Emphasis added).

159.    This 50-100 million card excess was accumulated by issuers in the months leading up to the IPO. Based on the Company's reported 35% market share, excess represented 23-47% of the Company's total EMV card sales in the first half of 2015.

160.    Defendant Montross further explained that a lack of demand from small and midsize issuers was attributable to their failure to adopt EMV. In relevant part, Defendant Montross stated:

[T]he **small to mid-sized issuer segment of the market** which represents over 35% of the financial payment card market and **where we have our highest market share is experiencing delays and the conversion to EMV**. As the first step in EMV issuance, the processor for the issuers must set up the issuer's accounts to process EMV transactions and must do extensive testing of the processors.

Also the process to configure and test the EMV cards to be issued by the banks is an additional technical and time consuming process. It is slower than anticipated test of EMV conversions for the small to mid-sized issuers is expected to delay to 2017, a significant portion of EMV card demand from this market segment.

We currently estimate that the impact to CPI from this deferral of EMV demand to future periods by the small to mid-sized issuers will be to reduce our 2016 revenues by approximately $35 million to $40 million compared to our original guidance.

(Emphasis added.)

161.    Defendants Montross and Brush noted that these trends had were driving increased competition for orders and increased pricing pressure.

162.    As a result of these factors noted in the May 11, 2016 Press Release and conference call, CPI reduced its financial projections for fiscal year 2016.

163.  On this news, price per share of CPI stock dropped precipitously from a close of $7.66 on May 11, 2016 to close at $4.01 on May 12, 2016 -- a drop of 47%, or over $3.65 per share.

164.  The statements referenced above that were made before May 11, 2016 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants and Tricor Fund Defendants or recklessly disregarded by them. Specifically, the Individual Defendants and Tricor Fund Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose the following: (1) at the time of the IPO, CPI's biggest customers had significant excess inventory of EMV cards as a result of those customers purchasing more cards than they were issuing in the period leading up to the IPO; (2) CPI itself had been experiencing a rapid accumulation of unsold EMV cards, necessitating the expansion of its vaults in order to securely store this inventory; (3) small and mid-size issuers, which represent a significant part of CPI's business, were slow to adopt EMV technology; (4) the Company was experiencing increased pricing pressure due to competition in the sale of EMV cards; (5) as a result of the foregoing, the growth experienced prior to the IPO could not reasonably be expected to continue; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, CPI's public statements were materially false and misleading at all relevant times.

165.  In breach of their fiduciary duties, the Individual Defendants and Tricor Fund Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

166.    Moreover, the Individual Defendants and Tricor Fund Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

167.    The Individual Defendants and Tricor Fund Defendants also breached their fiduciary duties by causing the Company to waste its corporate assets by spending vast amounts of funds on cards for which it was unnecessarily building up a huge inventory that had no bearing with market demand and by causing the Company to pay the Tricor Fund Defendants $10.7 million to redeem Company preferred stock and to pay Defendant Montross $4,775,832 to settle his awards under the CPI Acquisition, Inc. Phantom Stock Plan.  The amount thus paid to Defendant Montross was based on the Aggregate Fair Market Value of his awards.  That amount was determined by a committee of Board members.  Upon information and belief, that amount was artificially inflated due to the artificial inflation of the Company stock price caused by the false and misleading statements alleged herein.

168.    In further breach of their fiduciary duties, the Individual Defendants and Tricor Fund Defendants failed to maintain internal controls.

## DAMAGES TO CPI

169.    As a direct and proximate result of the Individual Defendants' and Tricor Fund Defendants' conduct, CPI has lost and will continue to lose and expend many millions of dollars.

170.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, its CFO, and its CAO, four of the directors on the current Board, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

171.    Such losses include vast amounts of funds on cards for which the Company was unnecessarily building up a huge inventory that had no bearing with market demand and payments in the amount of $10.7 million made to Tricor Fund Defendants to redeem their Company preferred stock of $4,775,832 to settle Defendant Montross's awards under the CPI Acquisition, Inc. Phantom Stock Plan.

172.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

173.    As a direct and proximate result of the Individual Defendants' and Tricor Fund Defendants' conduct, CPI has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' and Tricor Fund Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

174.    Plaintiff brings this action derivatively and for the benefit of CPI to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' and Tricor Fund Defendants' breaches of their fiduciary duties as directors and/or officers of CPI, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

175.    CPI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

176.    Plaintiff is, and has been at all relevant times, a shareholder of CPI. Plaintiff will adequately and fairly represent the interests of CPI in enforcing and prosecuting its rights, and, to

that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

177.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

178.     A pre-suit demand on the Board of CPI is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Seaman, Fulton, D. Pearce, R. Pearce, Peters, and Rowntree (the "Director-Defendants"), and non-parties Scott Scheirman ("Scheirman") and Silvio Tavares (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

179.     Three of the Director-Defendants have close business associations with the Tricor Fund Defendants, which collectively control 57.5% of the Company's stock, and which owned 90.9% of the Company's stock at the time of the IPO, and they comprised the majority of the 5-director  Board at the time of the IPO. Director-Defendant Rowntree is one of the founders of Tricor Pacific Capital, Director-Defendant Peters is a Managing Director at Parallel 49 Equity, the successor organization to Tricor Pacific Capital, and Director-Defendant Seaman is a Managing Partner of Parallel 49 Equity.  As a result of their employment at and/or membership with the Tricor Fund Defendants, Defendants Seaman, Peters, and Rowntree are beholden to the Company's controlling shareholder and thus cannot consider a demand to take action against the Tricor Fund Defendants with disinterestedness and independence.

180.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

181.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

182.    Additional reasons that demand on Director-Defendant Seaman is futile follow. Director-Defendant Seaman is a long-time Company Director and Board Chair. He is beholden to the Tricor Fund Defendants by virtue of his position at Parallel 49 Equity, and thus is unable to fairly and independently assess any demand made upon the Board. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Seaman is a defendant in the Securities Class Action. Director-Defendant Seaman also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  For these reasons, too, Director-Defendant Seaman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Director-Defendant Peters is futile follow. Director-Defendant Peters has served as a Company director since 2007. He is beholden to the Tricor Fund Defendants by virtue of his position at Parallel 49 Equity, and thus is unable to fairly and independently assess any demand made upon the Board. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Peters is a defendant in the Securities Class Action.  Director-Defendant Peters also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Peters breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Director-Defendant Rowntree is futile follow. Director-Defendant Rowntree has served as a Company director since 2007. He is beholden to the Tricor Fund Defendants by virtue of his being one of the founders of Tricor Pacific Capital, and thus is unable to fairly and independently assess any demand made upon the Board. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Rowntree is a defendant in the Securities Class Action. Director-Defendant Rowntree also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  Thus, for these reasons, Director-Defendant Rowntree breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.   Additional reasons that demand on Director-Defendant R. Pearce is futile follow. Director-Defendant R. Pearce has been a company director since 2007 and is a member of the Audit Committee. He received lavish compensation, including $149,586 in 2016. His large Company stock holding, worth over $1,463,431 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transaction before the fraud was exposed, which yielded approximately $216,201 in proceeds, demonstrates his motive in facilitating and participating in the fraud. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant R. Pearce is a defendant in the Securities Class Action. Defendant R. Pearce also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Defendant R. Pearce breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.   Additional reasons that demand on Defendant Fulton is futile follow. Defendant Fulton has served as a Company director since December 2015 and is a member of the Audit Committee. She received lavish compensation, including $130,386 in 2016. Her large Company stock holding, worth over $39,345 before the fraud was fully exposed, reveals her interest in keeping the Company's stock price as high as possible. As a director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to

make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Thus, for these reasons, Defendant Fulton breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant D. Pearce is futile follow. Defendant D. Pearce has served as a Company director sing January 2016 and as a member of the Audit Committee. He received lavish compensation, including $132,918 in 2016. His large Company stock holding, worth over $38,968 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant D. Pearce breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on non-party Scheirman is futile follow. Scheirman has served as a Company director since October 2016, and as the Company's CEO since October 5, 2017. Thus, as the Company admits, Scheirman is a non-independent director.  Scheirman is beholden to the Tricor Fund Defendants, as his employment depends on them, as they control the Company.  Thus, Scheirman could not impartially consider a demand to take action against the Tricor Fund Defendants or the Directors who face a substantial likelihood of liability due to being defendants in the Securities Class Action and who also control his employment. Thus, for these

reasons, Scheirman is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.    Additional reasons that demand on the Board is futile follow.

190.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants and Tricor Fund Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' and Tricor Fund Defendants' conduct. Thus, demand upon the Directors would be futile.

191.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' and Tricor Fund Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' and Tricor Fund Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

192.    CPI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CPI any part of

the damages CPI suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

193.    The Individual Defendants' and Tricor Fund Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

194.    The acts complained of herein constitute violations of fiduciary duties owed by CPI's officers and directors, and these acts are incapable of ratification.

195.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CPI. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of CPI, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

52

coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

196.    If there is no directors' and officers' liability insurance, then the Directors will not cause CPI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

197.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Montross, Brush, Dreiling, Seaman, Peters, R. Pearce, and Rowntree for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    Defendants Montross, Brush, Dreiling, Seaman, Peters, R. Pearce, and Rowntree ("Section 10(b) Defendants") participated in a scheme to defraud with the purpose and effect of defrauding CPI.  Not only is CPI now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon CPI by the Section 10(b) Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Section 10(b) Defendants' misconduct, the Section 10(b) Defendants caused the Company to redeem $10.7 million of the Tricor Fund Defendants preferred stock and to pay Defendant Montross $4,775,832 to settle his awards under the CPI Acquisition, Inc. Phantom Stock Plan.

200.    During the Relevant Period, the Section 10(b) Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce

and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

201.    The Section 10(b) Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CPI not misleading.

202.    The Section 10(b) Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Section 10(b) Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by CPI.

203.    The Section 10(b) Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Section 10(b) Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

204.    By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

205.    Plaintiff on behalf of CPI has no adequate remedy at law.

## SECOND CLAIM

**Against the Tricor Fund Defendants and all of the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

206.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.     The Individual Defendants and Tricor Fund Defendants, by virtue of their positions with CPI and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of CPI within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants and Tricor Fund Defendants had the power and influence and exercised the same to cause CPI to engage in the illegal conduct and practices complained of herein.

208.     Plaintiff on behalf of CPI has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants and Tricor Defendants for Breach of Fiduciary Duties**

209.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.     Each Individual Defendant and Tricor Fund Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CPI's business and affairs.

211.     Each of the Individual Defendants and Tricor Fund Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

212.     The Individual Defendants' and Tricor Fund Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company,

as alleged herein. The Individual Defendants and Tricor Fund Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CPI.

213.    In breach of their fiduciary duties owed to CPI, the Individual Defendants and Tricor Fund Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) at the time of the IPO, CPI's biggest customers had significant excess inventory of EMV cards as a result of those customers purchasing more cards than they were issuing in the period leading up to the IPO; (2) CPI itself had been experiencing a rapid accumulation of unsold EMV cards, necessitating the expansion of its vaults in order to securely store this inventory; (3) small and mid-size issuers, which represent a significant part of CPI's business, were slow to adopt EMV technology; (4) the Company was experiencing increased pricing pressure due to competition in the sale of EMV cards; (5) as a result of the foregoing, the growth experienced prior to the IPO could not reasonably be expected to continue; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, CPI's public statements were materially false and misleading at all relevant times.

214.    The Individual Defendants and Tricor Fund Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

215.    Additionally, while the Individual Defendants and Tricor Fund Defendants caused the Company's stock to be artificially inflated, three of the Individual Defendants benefitted themselves by engaging in lucrative insider sales on material inside information.

216.    Also in breach of their fiduciary duties, the Individual Defendants and Tricor Fund Defendants failed to maintain internal controls.

217.    The Individual Defendants and Tricor Fund Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants and Tricor Fund Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CPI's securities, and disguising insider transactions.

218.    The Individual Defendants and Tricor Fund Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants and Tricor Fund Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CPI's securities, and engaging in insider transactions and redemption of preferred stock. The Individual Defendants and Tricor Fund Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

219.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

220.    As a direct and proximate result of the Individual Defendants' and Tricor Fund Defendants' breaches of their fiduciary obligations, CPI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Tricor Fund Defendants are liable to the Company.

221.    Plaintiff on behalf of CPI has no adequate remedy at law.

## FOURTH CLAIM

**Against Individual Defendants and Tricor Defendants for Unjust Enrichment**

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and Tricor Fund Defendants were unjustly enriched at the expense of, and to the detriment of, CPI.

224.    The Individual Defendants and Tricor Defendants either benefitted financially from the receipt of funds received through the redemption of preferred stock or based on improper conduct received bonuses, stock options, or similar compensation from CPI that was tied to the performance or artificially inflated valuation of CPI, or received compensation that was unjust in light of the Individual Defendants' and Tricor Fund Defendants' bad faith conduct.

225.    Plaintiff, as a shareholder and a representative of CPI, seeks restitution from the Individual Defendants and Tricor Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and the Tricor Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

226.    Plaintiff on behalf of CPI has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants and Tricor Defendants for Abuse of Control

227.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.    The Individual Defendants' and Tricor Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CPI, for which they are legally responsible.

229.    As a direct and proximate result of the Individual Defendants' and Tricor Defendants' abuse of control, CPI has sustained significant damages. As a direct and proximate result of the Individual Defendants' and Tricor Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, CPI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Tricor Defendants are liable to the Company.

230.    Plaintiff on behalf of CPI has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

231.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CPI in a manner consistent with the operations of a publicly-held corporation.

233.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CPI has sustained and will continue to sustain significant damages.

234.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

235.    Plaintiff on behalf of CPI has no adequate remedy at law.

### SEVENTH CLAIM

**Against Individual Defendants and Tricor Defendants for Waste of Corporate Assets**

236.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.    The Individual Defendants and Tricor Fund Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company, to pay the Tricor Fund Defendants $10.7 million in redeeming their preferred stock holdings, and to waste corporate funds in accumulating a large inventory of cards that far surpassed market demand.

238.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants and Tricor Fund Defendants have caused CPI to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

239.    As a result of the waste of corporate assets, the Individual Defendants and the Tricor Fund Defendants are each liable to the Company.

240.    Plaintiff on behalf of CPI has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants and Tricor Fund Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of CPI, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants and Tricor Fund Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CPI;

(c)     Determining and awarding to CPI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Tricor Fund Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing CPI, the Individual Defendants, and Tricor Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CPI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of CPI to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding CPI restitution from Individual Defendants and Tricor Fund

Defendants, and each of them;

        (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: November 20, 2017            Respectfully submitted,

Of Counsel:                  **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**     /s/ Brian E. Farnan
Phillip Kim                     Brian E. Farnan (Bar No. 4089)
275 Madison Avenue, 34th Floor    Michael J. Farnan (Bar No. 5165)
New York, NY 10016            919 N. Market St., 12th Floor
Telephone: (212) 686-1060        Wilmington, DE 19801
Facsimile: (212) 202-3827         Telephone: (302) 777-0300
Email: pkim@rosenlegal.com       Facsimile: (302) 777-0301
                              Email: bfarnan@farnanlaw.com
**THE BROWN LAW FIRM, P.C.**    Email: mfarnan@farnanlaw.com
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net    *Attorneys for Plaintiff*